This is a suit for Workmen's Compensation under Act 20 of 1914, as amended, *Page 37 
plaintiff alleging that he is permanently and totally disabled, and is entitled to compensation for 400 weeks at 65% of his previous daily rate of pay, less such amounts as have already been paid to him.
Defendant admits the occurrence of the accident and that plaintiff was disabled thereby, and that it paid compensation to him for 175 weeks, believing that since he had lost one of his legs by amputation, he had sustained a specific injury and was entitled only to compensation as provided for the loss of a leg, because after the amputation he returned to work and actually earned wages equal to those which had been paid him prior to the accident. And defendant contends that after it made the final payment of compensation, plaintiff allowed more than one year to elapse before filing suit and that therefore the claim is barred by the prescription of one year as provided in the statute.
Plaintiff, however, points to the fact that after the last payment of compensation was made, defendant continued to pay him for services rendered, and he maintains that the prescription of one year did not commence to accrue until the last payment of wages was made, and that since that last payment of wages was made within one year of the filing of the suit, prescription has not accrued.
There was judgment for plaintiff and defendant has appealed.
The plaintiff, Ferdinand Pourciau, was employed by the defendant, Board of Commissioners of the Port of New Orleans (commonly known as "The Dock Board"), as a laborer. There is a stipulation in the record concerning the work he did prior to the accident. It reads as follows:
"He was engaged in heavy and laborious work, consisting of racking, handling, trucking and moving of bales of cotton weighing 500 pounds approximately per bale. It was necessary that he climb stacked bales of cotton to direct the movement thereof by crane from place to place in the dock shed."
On December 5th, 1936, a cotton bale fell on his left leg and it sustained a comminuted fracture. For several months it was thought by the doctors that the leg could be saved. Later, however, they determined that it would be best to amputate it, and on December 6th, 1937, this was done.
In the meantime, without any written agreement as to the extent of the injury or as to the probable duration of the period of disability, the Dock Board, commencing as of December 6th, 1936, the day after the accident, made weekly payments of compensation at 65% of the prior daily rate of pay, and it made these payments continuously for a period of 175 weeks, terminating on December 16th, 1939.
As we have said, the leg was amputated on December 6th, 1937. On January 15th, 1938, plaintiff was discharged from the hospital, and on September 23rd, 1938, he resumed his employment with the Dock Board and worked constantly from that time until April 23rd, 1941. Between the date of his reemployment (September 23rd, 1938) and the expiration of the 175th week after the accident, he was paid both weekly compensation at 65% of his prior daily rate of pay, and also the wages which he earned, and which were paid to him at the same rate which had been established prior to the injury.
On April 23rd, 1941, because of the development of heart trouble, in no way caused by or connected with the original accident, he voluntarily stopped working, though he did return for one day on August 19th, 1941.
When he was reemployed after the amputation, his work, according to the stipulation was
"Such work as he was able to do, consisting of light work, principally painting, sweeping and cleaning the dock shed."
This suit was filed December 12th, 1941, which was well within one year after the last payment of wages on August 19th, 1941, but was far more than one year, in fact, almost two years, after the receipt of the last payment of compensation. As we have said, defendant contends that the prescription of one year commenced to run when the compensation payments ceased on December 16th, 1939, whereas the contention of plaintiff is that that prescription did not commence to accrue until payment of wages ceased on August 19th, 1941.
Section 31 of the Workmen's Compensation Act, as amended by Act 29 of 1934, establishes the prescription upon which defendant relies. This section reads, in part, as follows: "That in case of personal injury (including death resulting therefrom) all claims for payments shall be forever barred unless within one year after the accident or death the parties shall have agreed upon the payments to be *Page 38 
made under this act or unless within one year after the accident proceedings have been begun as provided in Sections 17 and 18 of this Act. Where, however, such payments have been made in any case, said limitations shall not take effect until the expiration of one year from the time of making the last payment. * * *"
In Carpenter v. E.I. Dupont De Nemours Co., La.App., 194 So. 99, 101, our brothers of the First Circuit considered this section and held that the payment of wages had interrupted the course of prescription. Plaintiff places much reliance upon this case and maintains that it has established the doctrine that whenever there has been an injury producing disability to work, and the injured employee has been reemployed, the wages paid on reemployment may be pointed to as such payments as will, under the statute above quoted, prevent the running of the limitation of one year. We do not think that, in all cases, that is the necessary result of that holding, and we see a vast distinction here resulting from the fact that compensation payments, recognized as such were, for a time, made to the plaintiff, whereas no such compensation payments were ever made to the plaintiff in the Carpenter case. We can well understand that where disability is involved and no compensation agreement is reached, and no compensation payments are made, if the employee is reemployed and wages equal to or greater than the compensation payments are being paid to the employee, those payments should have the effect of interrupting prescription. But that is because, as is pointed out in the Carpenter and other cases, otherwise the employee might be misled and, for a full year, lulled into a sense of security and then told that since those payments represented wages and not compensation, they had not interrupted the course of prescription. But, where the employee is definitely told that he is being paid compensation and then when he is able to return to work is told that he is to be paid both compensation and wages, and then, still later, finds the compensation payments stopped, in no sense has he been misled by the continued payment of wages. He knows that his compensation has been discontinued, and the law provides that when such payments are stopped he must, within one year, file his suit or his claim will be barred by prescription. The court in the Carpenter case, referring to its earlier decision in Ulmer v. E.I. Dupont De Nemours Co., La.App., 190 So. 175, said:
"* * * We held that where an employee is injured in such manner that his capacity to work is affected and he is entitled to compensation, but the employer, instead, continues to pay him his usual wages whether his services are commensurate with the wages paid or not, and they equal or exceed the maximum amount of compensation he could receive under the statute, a suit for compensation for the period during which said wages are being paid would be premature."
We note the significance of the word "instead" and we think that it is quite true that if, instead of paying compensation, the employer pays wages, the payment of those wages ought to prevent the running of the limitation. But here the wages were paid not instead of compensation but in addition to it, and it was recognized that both were being paid, one as compensation and one as wages.
It is suggested that since plaintiff, a laborer, fitted by status, training and education only for hard, physical work, has lost a leg, he has, as a matter of law, become totally and permanently disabled, and from this it is argued that he could not have actually earned the wages which were being paid him and that, therefore, even though ostensibly paid as wages, the money which was given him each week actually represented compensation payments. But this argument is founded upon the theory that, as a matter of law, every laborer who loses a leg, without any proof as to whether he can perform work of any reasonable character, is automatically entitled to be paid compensation for 400 weeks for total, permanent disability instead of for 175 weeks for the loss of a leg.
Counsel for plaintiff argues that where a laborer loses a leg he may, without any proof as to whether he can or cannot do work of any reasonable character, claim compensation under paragraph (b) subsection 1 of Section 8 of the Act for permanent, total disability, whereas counsel for defendant declares that where such a laborer loses a leg, he is limited to the recovery of compensation for 175 weeks as provided by subparagraph (8) of paragraph (d) of Section 8 as amended by Act 85 of 1926, for the loss of a leg, unless it appears that the loss of the leg has caused total and permanent disability to do work of any reasonable character. And we agree with defendant that the mere loss of a leg does not, without further *Page 39 
showing, automatically entitle even an uneducated laborer to recovery for total, permanent disability.
If the Act could be so interpreted then in every case in which a laborer is so injured the provisions of paragraph (d) would, as a matter of law, have no application, although, as a matter of fact, the injured employee might be able to earn substantial wages as the plaintiff did here. It is quite true that nearly always where such a loss is sustained by an uneducated laborer there results total and permanent disability to do work of any reasonable character, which means work for which he is fitted by status, training and education. But there may very well be cases where this is not true, and in these cases, where the injured person may, in spite of the loss of the member, still carry on and do work of a reasonable character, he is entitled not to compensation for 400 weeks but to compensation for only 175 weeks for the loss of the leg.
We do not, for a moment, overlook the effect of the holding in Barr v. Davis Bros. Lumber Co., 183 La. 1013, 165 So. 185, and we realize that by that case, and the many others therein cited and discussed, it is well settled that where there is a specific loss of a member of the body and disability results, the disability must be looked to and considered and compensation paid in accordance therewith. But we also know that where the loss of the specific member of the body has caused disability for a shorter period than that for which compensation for the specific loss is provided, the compensation should be paid for the specific loss and not for the shorter period of disability. And, where the employee returns to work and does the work assigned to him before the end of the period during which he is paid compensation for the specific loss, if he wishes to claim that in spite of his being back at work and earning his wages, he is, nevertheless, permanently and totally disabled, the burden is on him to show on what he bases his claim. And this he must do within the year.
While it is true that there are cases in each of which it has been held that the particular laborer, because of his status, training and education, was entitled to compensation for total, permanent disability, although sustaining only the loss of an arm or of a leg, we do not find that these cases have established the principle that in every case where the laborer is so injured he is entitled to compensation for total, permanent disability without any showing of those facts from which may be drawn the conclusion that because of his education, training and status, complete and permanent disability has resulted.
It is true that it is now conceded that plaintiff has been completely and permanently disabled but this concession does not include an admission that when the compensation payments were discontinued the defendant had knowledge which would justify the conclusion that permanent, total disability had been sustained. On the contrary, the defendant had been advised by a medical expert that plaintiff could return to light work and, in fact, he had actually returned and was actually earning his full wages.
Our conclusion is that merely because plaintiff lost his leg, defendant was not automatically made liable for compensation for 400 weeks and, therefore, was not unreasonable in treating the plaintiff as entitled to compensation for the loss of the leg, and in discontinuing further payments after the 175th week. And this is particularly true since it is not shown that, as a matter of fact, plaintiff did not actually earn the wages which he was receiving. It does not appear that this money was being paid him as a gratuity; on the contrary, the record justifies the assumption that he was actually earning what was being paid him, the only difference between his status then and his status before the accident being that afterwards he was doing lighter work, such as painting, sweeping and cleaning.
And while we are considering the effect on the running of prescription of the payment of gratuities, let us remember that in Carlino v. United States Fidelity Guaranty Co., 196 La. 400,199 So. 228, the Supreme Court found that it was "not necessary to decide whether" the payment of a gratuity had the effect of interrupting prescription. It is our conclusion from the Supreme Court's holding in the Carlino case that it was not willing to go so far as our brothers of the First Circuit had gone in Carpenter v. E.I. Dupont De Nemours Co. and in Ulmer v. E.I. Dupont De Nemours Co., both supra, in holding that under all circumstances the payment of wages, whether earned or not, interrupts prescription. But even so, we see a vast distinction between those cases and *Page 40 
the case at bar in the fact that here, as we have already said, compensation, recognized as such, was for a time paid and was then discontinued.
The doctors who recommended the amputation of the leg had already advised defendant that if the leg should be removed, Pourciau, though not "suited for such work as climbing or trucking cotton * * * could perform any ordinary light duties."
Under all these circumstances, when defendant discontinued the compensation payments which it had been making, and based discontinuance upon the theory that plaintiff's recovery would be limited to the payments required by the Act because of the loss of a leg, if plaintiff believed that he was entitled to payments for total disability, it was incumbent upon him, — within the time provided by the statute — to bring his action. He was in no sense misled by the continued payment of wages because he well knew that the compensation payments had ceased. In fact, the stipulation which is found in the record shows that plaintiff well knew that the compensation was being paid for 175 weeks only, and well knew when it was discontinued. That stipulation reads as follows:
"When the final week's compensation, that is, the 175th week, was paid, all Workmen's Compensation terminated. There was no lump sum agreement and no compromise settlement of any kind."
There is an additional contention of plaintiff to which we have not yet referred and that is that when he was put back to work on September 28th, 1938, he was informed "* * * that defendant considered him unable to do the work which he had previously performed and considered him unable to do work of any reasonable character except light work; that if petitioner would return to light work he would be paid a salary commensurate with that work, but less than the salary which he had heretofore enjoyed, and would be held in such employment permanently."
When plaintiff tendered evidence in support of this allegation, it was objected to by counsel for defendant "on the ground that that testimony is incompetent and inadmissible under the law of the state; that the contract, if it were made by an employee with the Dock Board would be illegal."
The trial court ruled on this objection as follows:
"I think the objection is good, but I will refer the objection to the merits, just so that we can get the whole matter before the Court. I would maintain the objection, but if there is going to be an appeal, let us get it in."
The witness was John Falcon, who stated that he had called on a Mr. Schoen who, according to him, "had something to do with the settlement of these compensation cases", and that Mr. Schoen "told me that they would give Mr. Pourciau, or make a settlement with him of 175 weeks of compensation and then take care of him just as soon as he was able to go back to work."
Counsel for defendant then moved that this testimony be stricken from the record "on the ground that it is prohibited by law to make any settlement of compensation except in the manner provided by Act 20 of 1914."
This motion to strike was overruled.
The witness then said that it was his understanding of Mr. Schoen's statement that he, Schoen, would "give him a job for the rest of his life." The witness said: "I so told Mr. Pourciau * * * and that is what he understands even today."
Surely, no employee of such a public board has the right to make any such promise as a job for life, and surely the Compensation Act prohibits any such settlement. Furthermore, it is difficult to believe that Pourciau would have left so important a matter to Falcon, and would have been content to go back to work and to continue to work for more than a year without anything more tangible than the statement of Mr. Falcon. And surely, at the end of the 175th week, when plaintiff knew that his compensation was being discontinued and that he was back at work earning the wages which he was being paid, it was incumbent upon him to take some action in connection with his claim that he had been totally and permanently disabled.
We are of the opinion that the prescription of one year has accrued and plaintiff's claim for further compensation is barred thereby.
The judgment appealed from is annulled, avoided and reversed and plaintiff's suit is dismissed at his cost.
Reversed. *Page 41